UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDUARDO MARTINEZ, | : | Case No. 3:13-cv-00778 (MPS) |
| PHILLIP BROWNE, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CONNECTICUT DEPARTMENT OF CORRECTIONS, | : | |
| Defendants. | : | August 28, 2015 |

_____

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

Plaintiffs Eduardo Martinez and Phillip Browne allege that they were victims of employment discrimination on the basis of race and national origin during their time as correctional officers at the Central Transportation Unit ("CTU") of the State of Connecticut Department of Correction ("DOC"), the defendant in this case. They claim that they were denied two opportunities to be promoted to lieutenant in a manner that constituted disparate treatment and also has a disparate impact on minorities, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*[1] Martinez also claims that DOC retaliated against him for exercising his right to file a complaint about the discrimination, in further violation of Title VII. DOC has moved for summary judgment on all counts in the complaint. For the reasons set forth herein, the Court will grant in part and deny in part DOC's motion. The case will proceed only as to Martinez's retaliation claim and the plaintiffs' disparate treatment claim as to one, but not both, of the promotion opportunities.

---

[1] The plaintiffs originally alleged parallel claims under Connecticut state law, but have abandoned these claims. Their brief in opposition to the summary judgment motion urges that "the defendant's motion should be denied in with [sic] respect to plaintiffs' *federal* causes of action," ECF No. 48, Pls.' Mem. L. Opp. ("Opp. Br.") at 1 (emphasis added), and contains no opposition to DOC's argument that those state law claims are barred by the Eleventh Amendment. Summary judgment is therefore granted as to the state law claims.

## II.     Facts

### A.     Undisputed Facts[2]

Martinez is a Hispanic male of Puerto Rican heritage, and has been a correctional officer

with DOC since December 1995. From September 2006 to June 1, 2012, he was assigned to

CTU, a division of DOC responsible for transporting inmates. Browne is a black male who has

been a DOC correctional officer since September 2002 and been assigned to CTU since June 6,

2009. CTU is part of DOC Central Operations, which also includes K-9, Security Division,

Maloney Center for Training and Staff Development, and Special Operations Group. CTU

correctional officers are a self-selecting population; every one of them is there by seniority

pursuant to a voluntary transfer request.

On September 3, 2008, the Connecticut Department of Administrative Services ("DAS")

promulgated exam number 081010 for correctional lieutenant promotions within DOC. Martinez

and Browne each took and passed the exam, and therefore were on the DAS certified

examination list. On or about March 17, 2009, DOC invited both Martinez and Browne via letter

to participate in the recruitment process for lieutenant positions statewide. Martinez and Browne

were provided with a document outlining the interview process, were subsequently interviewed,

and completed the recruitment process. In August 2009, participating applicants were ranked and

sent a letter on or about August 11, 2009, setting forth their respective promotion eligibility tier

ranking (Excellent, Very Good, Average, Fair, Below Average, or Ineligible). Certain positions

---

[2] These facts are taken from the parties' statements submitted in accordance with D. Conn. L.R. Civ. P. 56(a). The rule requires the plaintiffs to "include a document . . . which states in separately numbered paragraphs . . . corresponding to the paragraphs contained in the [defendant]'s Local Rule 56(a)1 Statement whether each of the facts asserted by the [defendant] is admitted or denied." D. Conn. L.R. Civ. P. 56(a)2. The Court notes that DOC's Local Rule 56(a)1 Statement contains 54 numbered paragraphs, whereas the plaintiffs' statement in response contains only 53. The Court has nonetheless managed to determine which of the plaintiffs' paragraphs are responsive in determining which facts are in dispute.

at DOC are "specialized" or "specialty" positions. The August 2009 letter stated that "specialty" positions would require a separate recruitment process.

Both Martinez and Browne received a "Very Good" promotion eligibility tier ranking in the statewide evaluation process, as did their fellow correctional officer, Christy Semmelrock, a white woman. Like Martinez and Browne, Semmelrock also had completed the seven-part recruitment evaluation process for lieutenant promotional tier ranking. That process utilized a calculation that equally weighted each of the following to determine where a candidate fell on the DOC lieutenant promotional list: (1) exam score, (2) attendance, (3) the last two performance evaluations, (4) disciplinary history, (5) personal interview, (6) facility promotional evaluation; and (7) employee questionnaire.

In late 2010, two lieutenant positions within CTU were vacant and needed to be filled. William Colon, a Hispanic male, was the Director of Tactical Operations and Facility Operations for DOC in 2010 and was involved in the selection process. He considered both Martinez and Browne for one of the lieutenant positions (the "Semmelrock position" or "Semmelrock vacancy") but did not select them. Semmelrock was promoted to that position on December 3, 2010. Also promoted to CTU lieutenant (the "Fowler position" or "Fowler vacancy") was William Fowler, a white male, on November 19, 2010. These two lieutenant openings were the first CTU lieutenant jobs to be filled by promotion in the preceding five years.

On May 31, 2011, Martinez filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). Browne filed his CHRO complaint on June 8, 2011. This lawsuit followed and was filed on May 30, 2013.

### B.     Disputed Allegations

The parties' disputed characterizations of the record are summarized here. Further detail, with reference to specific evidence, is provided in the Court's later analysis of the individual claims.

Martinez and Browne claim that the process by which Semmelrock and Fowler were promoted had a disparate impact on minorities, thereby depriving them of the opportunity to compete fairly for lieutenant positions. They also allege disparate treatment, in that the promotion process was intentionally manipulated to exclude them from consideration because of their race and/or national origin. Finally, Martinez alleges that after he complained about the promotions to the CHRO, he experienced a string of adverse treatment at CTU, in the form of harassment and certain duties being reassigned, lost, or denied.

According to the plaintiffs, there is supposed to be a single, well-established, and defined statewide recruitment process that all officers must complete in order to be eligible for promotion for *any* open lieutenant position. There is a single classification for a correctional lieutenant involving the same duties, regardless of whether the position is titled as generalized or specialized. When vacancies become available, the warden is notified of candidates on the statewide promotion list who are qualified for the position. When a request is made to the Deputy Commissioner of Operations to fill an open lieutenant position, the request is submitted for approval specifying the title and position to be filled. Correctional lieutenant vacancies must then be approved by DAS. Normally, all correctional lieutenant vacancies that become available are posted publicly and, under administrative directives and a collective bargaining agreement, must be physically posted in hard copy on facility bulletin boards. Vacancies are also announced during roll-call.

The plaintiffs allege that the vacant positions ultimately filled by Semmelrock and Fowler were not posted on the CTU bulletin board and were not relayed during any roll-call. Correctional officers did not have access through work computers to the internet or DOC intranet and therefore relied upon the bulletin board postings to be notified of vacancies. Further, although Colon was the titular head of CTU, an official named Captain Shea essentially ran CTU, and Shea told Browne that the vacancy for a "second shift" lieutenant was not going to be filled and that he would be notified on the bulletin board if it became available.

The plaintiffs contend that Fowler was selected to fill the "second shift" position through a backdoor, non-standard process that has a disparate impact on minorities and, in this particular instance, was utilized intentionally to exclude potential minority applicants. Under the standard promotion system, Fowler was ineligible for promotion to a lieutenant post because he did not fully complete the statewide lieutenant recruitment process described above. As a captain at CTU, Shea would report CTU assignments and recommend transfers to Director Colon. The plaintiffs allege that Shea and Fowler were friends, that Shea made it known that he did not like black or female officers, and that there was an atmosphere of a "good ol' boys club" among the white officers. During the fifteen years prior to the plaintiffs' complaints, all supervisory personnel, including lieutenants, within CTU were Caucasian. Black and Hispanic officers were not promoted within CTU until after the plaintiffs' complaints.

At the point in 2010 when CTU had two correctional lieutenant vacancies, the "second shift" lieutenant role was being filled by overtime. A separate "administrative lieutenant" position was already filled by Lieutenant Todd Sturgeon. At some point, Shea had Sturgeon reassigned to the second shift lieutenant position, thereby creating a vacancy for the "administrative lieutenant" position. A facility warden can assign a lieutenant to a "specialized"

5

assignment by means of a "post order," which is merely a reassignment of a correctional officer who is already a permanent lieutenant. CTU then classified the vacancy as an administrative lieutenant position and utilized a special, unauthorized promotion process that was separate and distinct from the standard competitive process to be promoted to lieutenant. According to the plaintiffs, there is no directive or authority that allows a separate and distinct recruitment or promotion process for an officer being promoted directly to an "administrative lieutenant."

When the Fowler vacancy became available, both the DAS exam list and the lieutenant promotional list were available for review, providing CTU officials with information as to eligible candidates. Only four officers within CTU had fully completed the statewide correctional lieutenant promotional process and were eligible for promotion to correctional lieutenant within CTU: three minorities (Browne, Martinez, and non-party Officer Reyes) and one Caucasian (non-party Officer Kowalski).

Instead, CTU used a separate specialized recruitment process to promote Fowler. Fowler was promoted to the administrative lieutenant position after being interviewed by Colon, Shea, and DOC Human Resources Specialist Jim Faulkner. Approximately six weeks after Fowler was promoted to the administrative lieutenant position, he was transferred to the second shift lieutenant position, and Sturgeon was transferred back into the administrative lieutenant position. This violated the collective bargaining agreement, which provides that an officer is not allowed to be transferred into a different position until the completion of a six-month probationary period in his or her present position.

*     *     *

DOC denies that anyone ever intentionally manipulated the promotion process or retaliated against Martinez.

It describes its promotion process differently, in a manner suggesting that nothing atypical occurred. According to DOC, it has two general classifications of correctional lieutenants: "non-specialized" lieutenants and "specialized" lieutenants. The promotion process for specialized lieutenants is similar to the process for non-specialized lieutenants (requiring a passing DAS exam score and involving an interview and a review of personnel records) but is separate and differs slightly in that it does not require a facility evaluation or an employee questionnaire, and does not require a candidate to be ranked through the statewide process. Within CTU in late 2010, of its full complement of seven total lieutenants at that time, four were specialized: its administrative lieutenant, its operations lieutenant, its routing lieutenant for special training, and its routing lieutenant for regular transportation.

The March 2009 statewide recruitment announcement, which was posted physically in DOC prison facilities, via email, on the DOC intranet, and online on the DOC and DAS internet websites, invited Martinez and Browne to compete for *non-specialized* lieutenant positions, and the August 11, 2009 letter specifically noted that "specialty posts, such as in the Security Division, K-9 or Correctional Transportation Unit, are subject to a separate recruitment process; any such vacancies will require a separate posting, application and interview process."

DOC says that in late 2010, CTU had two different kinds of vacancies, one specialized (the administrative lieutenant position) and the other non-specialized (the Semmelrock position). It filled the non-specialized position from the statewide list, after considering the plaintiffs for promotion but ultimately deciding to promote the equally qualified Semmelrock instead. The administrative lieutenant position was advertised via e-mail, the DOC intranet, and the DOC and DAS internet websites, although DOC does not suggest that it was posted on the CTU bulletin board or announced during roll-call. Thirteen people applied and two withdrew at some point

prior to the interview phase. All eleven remaining candidates were interviewed. Of those eleven, two were black and one was Hispanic, for a total of three minority candidates out of the eleven candidates interviewed. Angel Medina, a Hispanic male of Puerto Rican heritage, was one of the minority candidates for the specialized opening. Despite being a personal friend of Colon at the time, Medina was not chosen because Colon believed that Fowler was the best candidate. Further, DOC says that prior to "expiration"[3] of the DAS exam list, a total of six specialized lieutenants were promoted within the DOC Central Office ranks (which includes CTU). One of the six promoted officers was black, and one was Hispanic.

## III.  Legal Standard on Summary Judgment

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted).

On summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).

---

[3] DOC does not explain what it means for a DAS exam list to "expire."

8

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted). "Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment." *Id.*

## IV.    Discussion

### A.    Disparate Impact (Martinez and Browne)

The plaintiffs allege that DOC "used an employment practice that caused a disparate impact on the minority Plaintiffs' [sic] that was neither job related for the specialized Correctional Lieutenant position, nor consistent with business necessity." Compl. ¶ 73. They have since clarified that their disparate impact claim pertains only to the "specialized recruitment process" used to promote Fowler and not the "non-specialized recruitment" used to promote Semmelrock. ECF No. 48, Pls.' Mem. L. Opp. ("Opp. Br.") at 10 ("Plaintiffs did not raise a disparate impact challenge to the non-specialized recruitment process . . . ."). For the reasons set forth below, the Court will grant summary judgment on this claim.

#### i.    Legal Standard

Title VII prohibits "both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). "To make out a prima facie case of disparate impact[:] . . . First, a plaintiff must identify a specific employment practice, rather than rely on bottom line numbers in an employer's workforce." *Malave v. Potter*, 320 F.3d 321, 325-26 (2d Cir. 2003) (quotation marks omitted). "Second, a plaintiff must present statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for .

. . promotions because of their membership in a protected group." *Id.* at 326 (same). "In the context of promotions, . . . the appropriate comparison is customarily between the composition of candidates seeking to be promoted and the composition of those actually promoted." *Id.* "Third, any statistics relied upon must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity when combined with other evidence." *Id.* (same).

"The employer may directly attack plaintiff's statistical proof by pointing out deficiencies in the data or fallacies in the analysis." *Easterling v. State of Connecticut*, 783 F. Supp. 2d 323, 331 (D. Conn. 2011) (quotation marks omitted). The employer may also rebut the plaintiff's prima facie showing by "proving that the employment practice that causes a disparate impact . . . is job related for the position in question and consistent with business necessity." *Id.* (same). "[I]f the employer is successful in rebutting the plaintiff's prima facie case, the plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id.* (same).

### ii.    Identifying a Policy or Practice

DOC argues that the plaintiffs have failed to identify a policy or practice because "one alleged instance of failure to post a job in a particular location does not constitute a cognizable 'employment practice.'" ECF No. 43-1, Def.'s Mem. L. Supp. ("SJ Mot.") at 13. Further, according to DOC, the plaintiffs' position "that [the Fowler promotion] constituted an intentionally discriminatory deviation from policy is fatal to their [disparate impact] claim because such a position 'is inherently inconsistent with a disparate impact claim, which is premised on a specific policy or practice that is applied equally to all candidates but has a

disproportionate impact on certain groups.'" ECF No. 52, Am. Reply to Pls.' Opp. ("Reply Br.")

at 2 (quoting *Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 277 (S.D.N.Y. 2001)).

The Court rejects DOC's argument.

      In making this argument, DOC does not deny that the "specialized" recruitment process

is, in fact, a general employment practice, similar to but distinct from the "non-specialized"

recruitment process—indeed, this is the very characterization of the recruitment process that

DOC itself urges the Court to accept. Rather, DOC is arguing that the plaintiffs have failed to

make such a claim, having instead chosen to characterize the Fowler promotion as a deviation

from general practices. The Court disagrees.

      Although the plaintiffs have objected to the characterization of the specialized

recruitment process as an *official* practice, they allege in the complaint and continue to argue that

specialized recruitment practices nonetheless go on without official authorization. *See* Compl. ¶¶

47-55 ("Defendant utilizes an undefined separate and distinct recruitment process for specialized

Lieutenant Positions . . . thereby circumventing the uniformly applied Lieutenant's Promotional

Process."). Specifically, the plaintiffs "challenge the overall decision making process used by

defendant to promote specialized lieutenants." Opp. Br. at 11. They contend that all three

"elements" of that process—the manner in which the opportunities are posted, the application

itself, and the interview process—should be viewed together as creating a disparate impact. *Id.* at

12. In addition to alleging that the vacant "specialized" position filled by Fowler was not posted

on the CTU bulletin board or relayed during any roll-call, the plaintiffs claim that DOC "without

authority, bypassed the Lieutenant's List, a prerequisite to be qualified for any and all lieutenant

promotions" and "allowed for officers who were not qualified for generalized lieutenant

positions to be assigned into such posts." *Id.* at 13. Further, as part of the "specialized"

11

recruitment process, DOC allegedly placed greater emphasis on the interview process and, while requiring a passing score on the DAS exam, did not actually consider the scores in making its promotion decisions. *Id.* As a result, according to the plaintiffs, the "specialized" recruitment process lacked clear standards and permitted prejudice to enter the decision-making. *Id.* at 14.

This case is therefore different from *Collette*—the only case cited by DOC on this issue—a case in which "[n]either in the Complaint, nor in her motion papers, nor at oral argument, ha[d] Collette alleged that this policy is not generally complied with, or that the failure to post these particular openings was anything but an isolated lapse." *Collette*, 132 F. Supp. 2d at 277. The plaintiffs here have argued that the break from official policy that elevated Fowler constitutes more than an isolated lapse. The fact that the plaintiffs describe the practice with specific reference to Fowler's promotion, which they also challenge as an individual instance of intentional discrimination, does not preclude them from making a separate disparate impact argument. Plaintiffs may, after all, plead in the alternative. Fed. R. Civ. P. 8(d). The fact that Fowler was the only person within CTU to be promoted by the process in several years does, of course, greatly impact the plaintiffs' ability to demonstrate a disparity and a causal relationship, *see infra* Subsection IV.A.iii, but does not mean that the plaintiffs have failed to "identify a specific employment practice." *Malave*, 320 F.3d at 326. Further, because DOC does not argue that the plaintiffs are *factually incorrect* about the existence of a separate process for specialized lieutenant promotions, the Court need not consider whether there is sufficient evidence in the record that such a practice exists.

### iii. Evidence of a Disparity and a Causal Relationship

Courts have "looked to the EEOC Uniform Guidelines on Employment Selection Procedures, 29 C.F.R. § 1607.4D . . . (EEOC Guidelines), for guidance in determining whether a

disparity is sufficiently substantial to violate Title VII . . . ." *Waisome v. Port Auth. of New York*

*& New Jersey*, 948 F.2d 1370, 1375-76 (2d Cir. 1991). Those guidelines provide:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or
> eighty percent) of the rate for the group with the highest rate will generally be regarded
> by the Federal enforcement agencies as evidence of adverse impact, while a greater than
> four-fifths rate will generally not be regarded by Federal enforcement agencies as
> evidence of adverse impact. Smaller differences in selection rate may nevertheless
> constitute adverse impact, where they are significant in both statistical and practical terms
> or where a user's actions have discouraged applicants disproportionately on grounds of
> race, sex, or ethnic group. *Greater differences in selection rate may not constitute
> adverse impact where the differences are based on small numbers and are not
> statistically significant*, or where special recruiting or other programs cause the pool of
> minority or female candidates to be atypical of the normal pool of applicants from that
> group. Where the user's evidence concerning the impact of a selection procedure
> indicates adverse impact but is based upon numbers which are too small to be reliable,
> evidence concerning the impact of the procedure over a longer period of time and/or
> evidence concerning the impact which the selection procedure had when used in the same
> manner in similar circumstances elsewhere may be considered in determining adverse
> impact.

29 C.F.R. § 1607.4(D) (emphasis added). "As an alternative measure of differences between

groups, we have also looked to whether the plaintiff can show a statistically significant disparity

of two standard deviations." *Smith v. Xerox Corp.*, 196 F.3d 358, 365 (2d Cir. 1999), *overruled

on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006).[4]

The plaintiffs claim that "no minority has ever been promoted in CTU under th[e

specialized] process." Opp. Br. at 11. They argue that this is the relevant statistic because their

claim pertains only to the specialized lieutenant process and because CTU operates

independently from other units in the DOC Central Office, and therefore the promotion of

minorities to lieutenant under the standard non-specialized process or outside of CTU is not

relevant. *Id.* at 14. Thus, because "Fowler was the only officer promoted under the specialized

---

[4] *See Smith*, 196 F.3d at 365-66 ("A standard deviation is a measure of variance from the mean (or average) value in
a given sample. Basically, looking at standard deviations indicates how far an obtained result varies from an
expected result. . . . If an obtained result varies from the expected result by two standard deviations, there is only
about a 5% probability that the variance is due to chance. Courts generally consider this level of significance
sufficient to warrant an inference of discrimination.") (citations omitted).

recruitment process in CTU in the last (5) years . . . 100% of the officers promoted in CTU were Caucasian." *Id.* at 15.

In this case, the "comparison . . . between the composition of candidates seeking to be promoted and the composition of those actually promoted," *Malave*, 320 F.3d at 326, is insufficient evidence for a reasonable fact-finder to determine that a disparate impact exists. If, as the plaintiffs urge, CTU should be viewed in isolation, then there is no comparison to make because no minority officers *within CTU* applied for the Fowler position; the plaintiffs claim that Fowler was "the only CTU officer to apply for the position." Opp. Br. at 17.

And even if the Court instead looked to the entire applicant pool for the Fowler position, including applicants from outside CTU,[5] the statistical evidence is insufficient. Of the eleven candidates who pursued the administrative lieutenant position through the interview phase, two were black, one was Hispanic,[6] and eight were white. One candidate, Fowler, was promoted. Although one can calculate a seemingly large difference in selection rate—0% of black, Hispanic, and minority applicants were promoted, whereas 12.5% of white applicants were promoted—the underlying data are simply too small to constitute sufficient evidence of a disparate impact, and the plaintiffs have not submitted any expert statistical analysis suggesting otherwise. *See, e.g.*, *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1371-72 (2d Cir. 1989) (finding in a case dealing with thirty-seven interviewees that "[t]o whatever extent the[ results] demonstrate any disparity, it is not sufficiently substantial to support an inference of discrimination, particularly in light of the unreliability of such a small statistical sample" and that "[t]he district court was justified in not accepting any such comparison as a statistically

---

[5] "In the typical disparate impact case the proper population for analysis is the applicant pool or the eligible labor pool." *Smith*, 196 F.3d at 368.
[6] The plaintiffs dispute whether the Hispanic applicant, Angel Medina, was ever actually interviewed, but do not dispute that Medina pursued his application through that phase. *See* Opp. Br. at 15.

significant basis for a disparate impact claim"); *Vidal v. Metro-N. Commuter R. Co.*, No. 3:12-CV-00248 MPS, 2014 WL 3868027, at *21 (D. Conn. Aug. 6, 2014) ("Even taken collectively across all of the years, a comparison of the performance of 51 Caucasian interviewees versus 19 Black interviewees or 8 Hispanic interviewees is likely insufficient to yield statistically significant results. In any event, Plaintiffs have not provided any evidence that these figures are statistically significant, such as by offering opinions by a statistics expert to support their analysis."); *Teasdale v. City of New York*, No. 08-CV-1684 KAM, 2013 WL 5300699, at *9 (E.D.N.Y. Sept. 18, 2013) ("Plaintiff alleges that only one male over 40 failed the EVOC twice while seven women over 40, or 99% of women, failed the EVOC test twice. This argument is deeply flawed because plaintiff's sample size of seven women and one man is extremely small, and the EEOC has cautioned that '[g]reater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant.'"), *aff'd sub nom. Teasdale v. New York City Fire Dep't, FDNY*, 574 F. App'x 50 (2d Cir. 2014).

The plaintiffs' claim that "no minority has *ever* been promoted in CTU under th[e specialized] process," Opp. Br. at 11 (emphasis added), suggests that a larger data set might be available, drawing on previous occasions in which minorities applied for promotion within CTU through the specialized process and were passed over. But the plaintiffs have not cited any such data about previous opportunities to be promoted within CTU through the specialized process or about the number of people who applied for those promotions.[7]

---

[7] The plaintiffs also claim that, even if *all* CTU promotions, both specialized and non-specialized, were considered, no minorities were promoted to lieutenant within CTU in the fifteen years leading up to this lawsuit, but they again have failed to provide any data about when applications were taken in the past or how many people applied. Opp. Br. at 15. This claim is also irrelevant, insofar as the plaintiffs have limited their disparate impact claim to the specialized process, which, according to the plaintiffs, involved unique factors. Opp. Br. at 10 ("Plaintiffs did not raise a disparate impact challenge to the non-specialized recruitment process . . . .").

A "statistically insignificant disparity in promotion rates" is not "probative evidence of the *absence* of a correlation between race and promotion," and therefore the plaintiffs may still present "other indicia raising an inference of discrimination." *Waisome*, 948 F.2d at 1379 (emphasis in original). Here, however, there are no such indicia from which a reasonable fact-finder could draw an inference of discrimination in the form of disparate impact.

The only other statistical support for the plaintiffs' disparate impact claim is their contention that if CTU had instead used the standard recruitment process to fill the administrative lieutenant vacancy, "almost 75% of the candidate pool from CTU" would have been minorities, as three of the four officially promotion-eligible officers were black or Hispanic. *Id.* at 17. This statistic plainly does not speak to whether the specialized process causes a disparate impact in its selection of lieutenants from applicants. The denominator underlying the 75% statistic—the pool of those from CTU eligible to apply through the official non-specialized process—is not the relevant baseline for a claim about the selection process, which should be the number of officers of each race who apply through the specialized process. Rather, the plaintiffs appear to raise the 75% statistic in relation to the effect that the specialized process has on attracting applicants in the first place. They argue that the specialized process fails to notify and attract minority applicants adequately, as demonstrated by the fact that 75% of officers within CTU eligible to apply were minorities, whereas 0% of CTU applicants were minorities.

Such recruitment-based theories of disparate impact are cognizable,[8] but the plaintiffs' 75% statistic does not support their disparate impact claim. The plaintiffs contend that Fowler was "the only CTU officer to apply for the position," Opp. Br. at 17, because the other applicants

---

[8] *United States v. Brennan*, 650 F.3d 65, 126-27 (2d Cir. 2011) ("[W]e reject the . . . contention that . . . allegedly discriminatory recruiting practices [such as] word-of-mouth recruiting, and limited advertising . . . are not prohibited by Title VII even if they cause a disparate impact. . . . [T]his court, many years ago, concluded that a *prima facie* case of disparate impact existed based on subjective word-of-mouth hiring methods.") (quotation marks omitted).

came from outside CTU. So again the plaintiffs provide only a single instance of the measured outcome, i.e., applications from CTU officers, which is a data set far too small for a reasonable fact-finder to draw any conclusions about the recruitment process.

The remaining "indicia" presented by the plaintiffs are qualitative and based on either anecdotes or generalized statements offered by witnesses. Summarizing this evidence, the plaintiffs claim that "lower ranking Caucasian officers were promoted over higher ranking minority officers," that "[i]t was widely known that there was ongoing discrimination in CTU," that "[t]here was a history of discrimination complaints concerning Captain Shea specifically," and that "the specialized recruitment process lacked clear standards and guidelines" and "promotions were granted based on opinion rather than qualification." Opp. Br. at 16-17. For example, Lisamarie Fontano, a former union representative for DOC officers, stated that "[t]here were several discriminational issues going on in CTU" and "the one who grades the best as excellent is not always the one that's being promoted." ECF No. 48-8, Pls.' Exh. F ("Fontano Dep.") at 25.[9] Fontano also testified that she spoke with Director Colon regarding the plaintiffs' complaints about the Fowler promotion, that "there were several discrimination issues with" Captain Shea, and that Shea "was known for doing whatever [he] wanted to do" despite the fact that Colon technically had authority over him. *Id.* at 31-36. In his deposition, Martinez testified that "Captain Shea told [him] that he didn't like blacks and he didn't like females." ECF Nos. 43-5, Def.'s Exh. E ("Martinez Dep. I") at 21. Officer Medina testified that in his time at CTU "issues of discrimination or disparate treatment [had] been brought to [his] attention"— specifically, the discrimination claims by the plaintiffs and also by an Officer Rodriguez. ECF No. 48-14, Pls.' Exh. L ("Medina Dep.") at 18. Medina described the discrimination as "certain

---

[9] It is unclear whether Fontano was adopting that view of CTU or merely summarizing the plaintiffs' concerns when they filed a discrimination complaint, as her answer was in response to a question about the nature of the plaintiffs' concerns.

officers being treated unfair, changing of posts just because they didn't like—basically an easy post was given to an officer." *Id.* at 19. He also said that white officers "hung out with [Lieutenant Sturgeon] all the time," whereas the minority officers did not. *Id.* at 34.

These anecdotal reports of past intentional discrimination and an atmosphere of a "good ol' boys club" may, of course, bolster the plaintiffs' claims of intentional discrimination, which the Court will address separately. But a reasonable fact-finder could not return a finding of *disparate impact* on the basis of such evidence where, as here, the plaintiffs have provided no expert statistical analysis and the available quantitative "data" comprise only a single promotion of a white employee rather than a minority employee. Neither the *Waisome* case, which is the only authority cited by the plaintiffs on this issue, nor *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012), which also speaks to the issue, supports such a proposition.

In *Waisome*, "[t]he promotion rate of black candidates participating in the entire promotion process (5 of 63, or 7.93 percent) was 55.52 percent of the comparable rate for white candidates (70 of 499, or 14.03 percent), considerably lower than the 80 percent figure recommended as a rule of thumb by the EEOC guidelines," but was not statistically significant at the threshold of two standard deviations because "the difference in promotion rates was 1.34 standard deviations." *Waisome*, 948 F.2d at 1378-79. The Second Circuit found error in the district court's conclusion that "the difference in promotion rates of less than two standard deviations was conclusive of a failure to reliably demonstrate a disparate impact" and instructed that "in cases involving small or marginal samples, other indicia raising an inference of discrimination must be examined." *Id.* at 1379. The *Waisome* court then discussed "other indicia" in the form of related statistics, not anecdotal evidence of intentional discrimination. The court cited the fact that although the final promotion figures were too small to prove that the

18

observed disparity was significant, "[t]he plaintiffs were able to point to a specific element of the promotion process, the written test, and show—using in that aspect of the case a sufficiently large sample size—that it resulted in a statistically significant disparity," which "support[ed] the inference that the lack of statistical significance in the ultimate promotion figures reflect[ed] only the small sample size." *Id.* *Waisome* therefore endorses supplementing bottom-line promotion statistics drawn from small data sets with other related statistics involving larger numbers, which is consistent with EEOC guidance. 29 C.F.R. § 1607.4(D) ("Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact.").

*Chin* (under a different name in the district court) involved a data set of 36 promotions from 271 applications and testimony by a statistics expert who opined that "there is an approximately 13% likelihood of observing by chance the given distribution of Asian–American officers promoted" and that "although his results were not significant at the 5% level, he believed that those results were significant because the small sample size made it impossible to provide statistical evidence at the 5% level." *Port Auth. Police Asian Jade Soc. of New York & New Jersey Inc. v. Port Auth. of New York & New Jersey*, 681 F. Supp. 2d 456, 468 (S.D.N.Y. 2010). On appeal, the Second Circuit upheld the jury's verdict in favor of the plaintiffs, noting that "the plaintiffs offered other evidence that reasonable jurors could have relied upon to find that an 87-percent likelihood that the disparity was not due to chance qualified as significant"—specifically, a "substantial amount of evidence that reasonable jurors could have relied on to conclude that the

plaintiffs were more qualified than some of the white officers who were promoted, including comparing length of service, attendance records, and disciplinary histories." *Chin*, 685 F.3d at 153. The court held that "[i]n the context of this case, it would not be unreasonable for a juror to find [the expert's] statistics significant despite only being significant at the 13–percent level." *Id.*

Here, in contrast, there is no expert statistical analysis or opinion as to the likelihood of a disparity appearing by random chance, and there is an extraordinarily scant amount of quantitative information, involving much smaller numbers even than *Waisome* and *Chin*—on its face, not data from which a reasonable fact-finder could infer the existence of a significant racial disparity caused by the specialized promotion process. Even if the anecdotal reports of past intentional discrimination and an atmosphere of a "good ol' boys club" furnished by the plaintiffs could be considered as "other indicia" of disparate impact—which is a dubious proposition not clearly endorsed by *Waisome* or *Chin*—those indicia could not compensate for the near-complete lack of statistical proof in this case. Because based on the evidence in the record no reasonable fact-finder could conclude that there is "causal relationship between the challenged practice and [a racial] disparity," *Malave v. Potter*, 320 F.3d at 326, the Court GRANTS summary judgment as to the plaintiffs' disparate impact claim under Title VII.

**B.     Disparate Treatment (Martinez and Browne)**

The plaintiffs have also brought a claim under Title VII for intentional discrimination, or disparate treatment. DOC argues that the plaintiffs have failed to produce sufficient evidence to support a prima facie case of disparate treatment and/or sufficient evidence that DOC's non-discriminatory explanation is pretextual. For the reasons set forth below, the Court finds that the record would permit a reasonable fact-finder to conclude that there was intentional discrimination in connection with the Fowler position, but would not permit the same conclusion

in connection with the Semmelrock position. The Court will therefore grant in part and deny in part summary judgment on this claim.

### i.        The Nature of the Plaintiffs' Claim

As an initial matter, the Court must determine the specific type of disparate treatment claim at issue. In the complaint, the plaintiffs allege that the DOC used a "separate recruitment process" and a "notification process" that "facilit[ates] intentional discrimination" and "allowed intentional discrimination to occur." Compl. ¶¶ 77-78. Those particular allegations appearing under the complaint's "disparate treatment" heading do not clearly articulate the way in which the plaintiffs believe that they were intentionally treated differently. In its summary judgment motion, DOC argues that "the plaintiffs' disparate treatment claim is not that the defendant failed to promote them" and that the plaintiffs instead "allege that they intentionally were not made aware of the two CTU lieutenant openings that ultimately went to Fowler (specialized) and Semmelrock (non-specialized), both Caucasian," and therefore "had no opportunity even to apply." SJ Mot. at 8-9. DOC contends that, as a result, there has been no allegation of an "adverse employment action" here, under the general standard applicable to disparate treatment cases. *See Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.") (quotation marks omitted).

The Court, however, interprets the complaint in its entirety to allege disparate treatment in the form of DOC's failure to promote the plaintiffs, which is the most natural and commonsense understanding of the plaintiffs' claim despite the confusing emphasis on the recruitment and notification process *itself* in the small portion of the complaint beneath the "disparate treatment" heading. The plaintiffs' summary judgment briefing, perhaps guided by

DOC's interpretation of the complaint, also lacks clarity on this issue, arguing in one portion that "[t]he physical withholding of the posting was an adverse act," Opp. Br. at 5, and elsewhere that "100% of the eligible minorities officers were denied the opportunity to apply [which] constitutes adverse employment action," *id.* at 8, but nonetheless offers a sufficient, albeit muddled, articulation of the plaintiffs' position. The Court interprets their position to be that DOC discriminated against them by denying them promotions on the basis of their race and/or national origin, and that utilizing the unofficial "specialized" promotion process and providing inadequate notification were the means by which DOC did so.[10]

### ii.   Legal Standard

"To establish a *prima facie* case of a discriminatory failure to promote, a Title VII plaintiff must ordinarily demonstrate that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009). "[F]or the plaintiff to avoid an adverse judgment, there must be proof that the plaintiff was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* (quotation marks omitted).

"[T]he second element of a prima facie case cannot be established merely with evidence that a plaintiff generally requested promotion consideration" and "[a] specific application is

---

[10] Although portions of the plaintiffs' Rule 56(a)2 Statement and a single paragraph of their summary judgment brief discuss the promotion of Semmelrock in a manner suggesting that *sex* discrimination occurred when DOC chose among applicants, ECF No. 48-1, Pls.' L.R. 56(a)2 Statement ("Pls. 56 Stat.") at 24 ¶¶ 37-38 ("Semmelrock was selected for the promotion because Colon knew her and because he wanted some diversity in the unit and wanted a female supervisor."); Opp. Br. at 4 ("Director Colon testified that Semmelrock was promoted because he knew her and because he wanted a female in the unit."), the allegations in the complaint pertain only to racial and national original discrimination, and the summary judgment brief expounds a theory of disparate treatment based on actions taken "to hide the promotional opportunity from the minority plaintiffs," *id.* at 7, not based on an intentional choice to promote a female applicant over a male applicant. The Court therefore does not consider the plaintiffs to have made such a claim.

required . . . ." *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004). "[T]o be excused from the specific application requirement, an employee must demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Id.* The exception does not apply "simply because an employee asserts that an 'aura of discrimination' in the workplace somehow discouraged her from filing a formal application." *Id.* at 227.

"[I]f the plaintiff succeeds in presenting a prima facie case, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). "[T]he plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.* "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Id.* (quotation marks omitted). "[I]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Id.*

### iii. The Fowler Position

#### a. The Application Requirement[11]

Because the plaintiffs have not claimed that they applied for the Fowler position, they must qualify for the *Petrosino* exception in order to prevail on their claim that they were discriminatorily denied an opportunity to be promoted to that position. *See Petrosino*, 385 F.3d at 226 ("[T]o be excused from the specific application requirement, an employee must

---

[11] DOC does not dispute that the plaintiffs are members of a protected class and were qualified for promotion.

demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer."). On this issue, there is a genuine dispute of material fact.

With regard to the Fowler position, DOC claims that "[t]he Fowler administrative lieutenant job opening was sent out via DOC e-mail, and posted electronically on the DOC intranet, and DOC and DAS internet websites; however, neither plaintiff checked online or saw it." ECF No. 43-2, Def.'s L.R. 56(a)1 Statement ("Def. 56 Stat.") ¶ 40. Further, DOC maintains that the plaintiffs "discovered that the 2010 CTU Administrative Lieutenant position physically had been posted in *other* DOC facilities prior to Fowler's promotion into it." *Id.* ¶ 41 (emphasis added).

The plaintiffs deny much of this and claim that the "[p]osting only occurred on the DAS website and was sent out to an unknown recipient list," and that some correctional officers, including Martinez, lacked access to DOC email and the DOC intranet. ECF No. 48-1, Pls.' L.R. 56(a)2 Statement ("Pls. 56 Stat.") at 11 ¶ 39; 19 ¶ 17. They say that they learned about the physical postings in other DOC facilities only *after* Fowler had already been promoted. *Id.* at 12 ¶ 40. They also contend that vacancies "have always been posted on facility bulletin board pursuant to [administrative directives] and the Collective Bargaining Agreement" and are "also announced during roll-call," which did not occur for the Fowler position. *Id.* at 19 ¶ 16. Finally, the plaintiffs claim that Shea told Browne that "the second shift lieutenant position was not going to be filled and . . . they would be notified if it became available." Pls. 56 Stat. at 19 ¶ 15. They argue that these actions were taken "to hide the promotional opportunity from the minority plaintiffs" because DOC knew that 75% of the CTU officers on the official promotions list were minorities. Opp. Br. at 7.

24

The parties therefore agree that there was some publicizing of the Fowler position, on the DAS website and in physical postings at *other* DOC facilities. The Court does not, however, interpret the *Petrosino* exception so categorically as to disappear merely because an employer publicizes a position to any degree whatsoever, regardless of the manner in which a posting is distributed and the likelihood that it will be seen by potential applicants.[12] Rather, *Petrosino* itself considered whether "employees . . . could not reasonably have known about all available positions through the company's posting policy" in determining whether the plaintiff had "satisf[ied] the first prong of the specific application exception" and explained that the purpose for the exception is to prevent the specific application requirement from becoming too "inflexible" because "[t]he law recognizes that the facts of a particular case may sometimes make a specific application a quixotic requirement." *Petrosino*, 385 F.3d at 227 (quotation marks omitted); *see also Mauro v. S. New England Telecommunications, Inc.*, 208 F.3d 384, 387 (2d Cir. 2000) ("[T]he record here could allow a jury to conclude that SNET knew of Mauro's interest in being promoted to a Level Two job but nonetheless failed to make him aware of any promotion opportunities to those positions as they arose. This case thus presents the factual scenario that . . . might suffice to relieve the plaintiff of the burden of showing that he applied for the promotion at issue."). Determining whether DOC's actions constituted "posting" of the vacancy therefore requires a close examination of all the circumstances.

As to posting by email and the internet, although the plaintiffs have conceded that the posting appeared on the "DAS website," DOC has produced little to support its larger claim that "[t]he Fowler administrative lieutenant job opening was sent out via DOC e-mail, and posted

---

[12] This Court previously confronted a similar question about the scope of *Petrosino* but determined that it was unnecessary in that case to resolve the question. *Ighani v. City of Hartford*, No. 3:09-CV-2111 JCH, 2012 WL 3728025, at *3 (D. Conn. Jan. 4, 2012) ("Ighani appears to argue that a job vacancy posted in a manner that deviates from an employer's typical practices should be considered "not posted" under *Petrosino*. The court finds it unnecessary to decide this issue.").

electronically on the DOC intranet, and DOC and DAS internet websites." Def. 56 Stat. ¶ 40.
DOC has not provided archived copies of the actual web postings or described how a visitor of
the websites would navigate to the relevant pages. It points to a document announcing a "Job
Opportunity" for "Correctional Transportation Unit - Administrative Lieutenant, Cheshire Base"
with a "Closing Date" of September 28, 2010, but no documents or testimony as to where the
document was posted, including whether it was ever posted on any website. ECF No. 43-14 at
23, Def.'s Exh. V. It also points to a short email sent by one Heather DiMauro to recipients "DL
Mailing; Posting emails" on September 14, 2010, saying that "Employment Opportunities for
Office Assistant, Correctional Lieutenant-Revised, and Correctional Counselor . . .  are available
for your viewing for the week of September 13 - September 27, 2010 at http://www.ct.gov/doc/
cwp/view.asp?a=1496&q=270230." *Id.* DOC does not, however, cite any evidence that the
plaintiffs would have received emails sent to "DL Mailing; Posting emails" or that the web
address referenced in the email actually contained a posting for the Fowler position.

  The plaintiffs have introduced deposition testimony rebutting much of DOC's
characterization of the circumstances surrounding the posting of the vacancy. Martinez testified
in his deposition that he never received an email about job postings, that he did not have internet
access at work, and that although he had a DOC email address at one point, it had been
"disconnected." Martinez Dep. I at 39, 96. He then clarified that CTU staff members were "not
allowed to access a computer from CTU" and that "[w]e requested it, but they said we didn't
need access to the intranet." *Id.* at 40-41. Therefore, although he could potentially access his
DOC email elsewhere, such as the DOC central office, he could not do so at CTU because "back
then you had to be inside a building with a computer that was connected to the network to be
able to check your e-mails." *Id.* He admitted that he did not check the DOC or DAS websites

because he "looked at the bulletin board in every facility [he] worked at," where promotional

opportunities were "always posted." *Id.* at 98. Browne testified that he did not check the websites

because his superior, Shea, had told him that the vacancy at CTU was not going to be filled and

that if a vacancy were to open up, "there will be a posting on the bulletin board and people will

tell you," ECF No. 43-7, Def.'s Exh. G ("Browne Dep. I") at 42, and "like being in the service . .

. [i]f you got an order from a higher-up and they say, I will let you know what to do . . . [y]ou're

waiting for that order," ECF No. 43-8, Def.'s Exh. H ("Browne Dep. II") at 64-68.

   As to the physical postings elsewhere, Browne testified that he heard from DOC officers

at other DOC facilities that the Fowler position had been physically posted and announced

during roll call and that he believes that those protocols were intentionally not followed at CTU

because there were minority CTU officers eligible for promotion, but also that he didn't

determine this until "well after Fowler got actually promoted." Browne Dep. I at 47-48, 51, 178;

Brown Dep. II at 91-93. Martinez testified that he spoke to a DOC officer in Bridgeport "after

the fact," and the officer had seen a physical posting for the Fowler position on the bulletin board

in Bridgeport, which Martinez would not have access to. Martinez Dep. I at 129-30; ECF No. 43-

6, Def.'s Exh. F ("Martinez Dep. II") at 212-14.

   As additional support, the plaintiffs provide evidence of a policy and custom of posting

job vacancies on physical bulletin boards at each DOC facility. State of Connecticut Department

of Correction Administrative Directive 2.3 provides:

> Job postings for each classified position may be posted and advertised in the
> following manner:
>> A. Bulletin Boards. Each work location shall maintain a bulletin board
>> designated for posting employment vacancies and examination
>> announcements. All examination announcements for positions in the
>> classified service shall be posted. In the event a *collective bargaining*
>> *agreement* contains more detailed posting requirements, those
>> requirements shall be followed as applicable.

B. Electronic listings. Job postings may also be located on:
1. Department of Administrative Services (DAS) website and,
2. DOC website and Intranet.

ECF No. 43-14 at 13, Def.'s Exh. U ("AD 2.3") ¶ 7 (emphasis added). The plaintiffs have also

produced "excerpts of Correctional Supervisors Unit (NP8) Collective Bargaining Agreement,"

which provide:

> Section 2. Bulletin Board. (a) The State shall furnish a minimum of one (1)
> bulletin board at each institution which the Union may utilize for their
> announcements and Union material.
> . . .
> (b) Agency bargaining unit vacancies, including promotional opportunities within
> the bargaining unit, shall be posted at least ten (10) calendar days prior to the
> closing date of the promotional position.

ECF No. 48-7, Pls.' Exh. E ("CBA"). The authenticity and applicability of this CBA have not

been established, and the language is not entirely unambiguous. In its reply brief, however, DOC

does not challenge this evidence, and the plaintiffs have bolstered their claim with testimony by

Fontano, the union representative. Fontano Dep. at 11-12 ("[T]hey would have to post them in

the facilities so that the facility—whoever worked at the facility and didn't have access because

there's minimum access for individuals to the Web."); *id.* at 48-55.

Finally, Browne's account of his conversation with Captain Shea, if credited and

construed in the light most favorable to Browne, strongly supports his case.[13] Under that

favorable reading of the record, Shea did not merely discourage Browne from applying for the

position—which would be fatal to Browne's ability to invoke the *Petrosino* exception. *Petrosino*,

385 F.3d at 227 (exception not applicable "simply because an employee asserts that an 'aura of

discrimination' in the workplace somehow discouraged her from filing a formal application").

Rather, Shea, who was Browne's superior and directly involved in the hiring process at CTU,

effectively told Browne that there *was no vacancy* to apply for, which would give Browne reason

---

[13] Martinez was not a party to or aware of this discussion with Shea. *See* Martinez Dep. II at 184-85.

to believe that no promotion opportunity actually existed, even if other DOC communications might have suggested otherwise.

Based on all this evidence, construed in the light most favorable to the plaintiffs, a reasonable fact-finder could determine that employees in the plaintiffs' position "could not reasonably have known about [the] position[]." *Petrosino*, 385 F.3d at 227. Although the parties do not dispute that the Fowler position was posted somewhere on the DAS website at some point and physically posted at other DOC facilities, the parties do, in substance, dispute whether it was reasonable for the plaintiffs to be unaware of the Fowler position. In light of the facts in this case, this is a genuine dispute that must be resolved by the fact-finder. Although posting a job vacancy on the internet will often constitute a "posting" sufficient to preclude the *Petrosino* exception, there is no evidence as to what the internet posting here looked like, where within the website it appeared, or how a visitor would navigate to it. Further, there is significant evidence that in several ways DOC led the plaintiffs to expect and rely upon physical postings. While the physical postings at DOC facilities other than CTU would likely preclude officers at those facilities from invoking the *Petrosino* exception, there is nothing in the record suggesting that it would be reasonable for these plaintiffs, who worked at CTU, to have been aware of those postings. And finally, Shea's conversation with Browne would provide an additional basis for a fact-finder to conclude that it was reasonable for Browne to believe that no vacancy existed.

### b. Circumstances Giving Rise to an Inference of Discrimination, DOC's Legitimate Explanation, and Pretext

There is also a genuine dispute of material fact as to whether the circumstances in this case give rise to an inference of discrimination, as well as whether DOC's legitimate explanation for those circumstances is pretextual. The plaintiffs claim that CTU departed from normal promotion and notification procedures and used an unofficial procedure—bypassing the

statewide list of officers eligible for promotion and also failing to provide adequate notice of the vacancy to CTU officers—as a backdoor means of ensuring that a white officer (Fowler) could apply and that minority officers within CTU would not automatically be considered (which ordinarily would occur because of their presence on the statewide promotion list) and would be unaware of the opportunity to apply. There is sufficient evidence in the record for a reasonable fact-finder to accept the plaintiffs' version of events—a version of events that could give rise to an inference of discrimination—and also to reject as pretextual DOC's non-discriminatory explanation that the process used to promote Fowler was the proper and standard method for filling the particular type of vacancy that existed.

The record is not clear as to which officials within CTU, or DOC more generally, exercised control over the process. Director Colon, Captain Shea, and HR Specialist Faulkner all seem to have had a role. It was Colon who, according to his own account and also Faulkner's, would have the authority as director to reassign an administrative lieutenant to a shift lieutenant position and to specify in an approval request to DAS whether CTU was seeking to fill an administrative lieutenant vacancy or a shift lieutenant vacancy. ECF No. 43-10, Def.'s Exh. J ("Faulkner Dep.") at 31-34, 52-54; ECF No. 43-11, Def.'s Exh. K ("Colon Dep.") at 40-44. But the plaintiffs contend that Shea was the principal decision-maker at CTU, subject only to a rubberstamping by Colon, and there is support for this in the record. Martinez Dep. I at 81 (testifying that Shea had control over the positions); Browne Dep. I at 171-72 (characterizing Colon's role as essentially to sign off on Shea's decisions); Browne Dep. II at 30-32 (same); Fontano Dep. at 34 (opining that, although Colon should have control over Shea and have final say over Shea's decisions, he did not in practice); *id.* at 57-59 (testifying that, although Shea would not have authority to promote Fowler entirely on his own, Shea was given a great deal of

freedom, and stating that "I've seen crazier things happen" and "have seen things like that happen where certain people get promoted and I don't know how"); Colon Dep. at 11-12 ("[T]hat function's out of my hands. That's on the captain's hands. He runs the base."); ECF No. 48-21, Pls.' Exh. S ("Transfer Memo") (CTU memorandum from Shea reassigning Sturgeon to the position of administrative lieutenant).

A reasonable fact-finder could infer that Shea's influence, if not his direct control, drove decisions about how the Fowler position would be filled. *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004) ("[I]mpermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process."). Shea also had a preexisting friendship with Fowler, according to the plaintiffs. Browne Dep. I at 160-61. The fact-finder could therefore infer that, having used his influence to try to exclude applications from minorities, Shea then directly or indirectly communicated with Fowler about the vacancy through informal channels. Thus, contrary to DOC's suggestion, the fact that Colon was Hispanic certainly does not undermine Browne's claim, nor does it necessarily undermine Martinez's claim. Likewise, the fact that publicity of the Fowler position *outside* of CTU was handled differently—and resulted in applications from three non-CTU minority officers over whom Shea had no control—does not preclude a reasonable fact-finder from determining that Shea, motivated by prejudice, manipulated the process within CTU to the extent that he was able in order to exclude minorities from consideration.

The question then becomes whether there is sufficient evidence that Shea was acting with discriminatory intent in influencing the procedures by which the promotion was made. As

already discussed, *supra* Subsection IV.A.iii, there is evidence that Shea harbored prejudice toward minorities, including Fontano's testimony about a history of "several discrimination issues with" Shea , Fontano Dep. at 31-36, and Martinez's testimony that Shea told him that "he didn't like blacks," Martinez Dep. I at 21. Shea also told Browne that the vacancy was not being filled, which could reasonably be interpreted as an intentional misrepresentation, given Shea's direct involvement in the process to fill that vacancy. And for the reasons elaborated below, a fact-finder could reasonably reject as pretextual DOC's proffered non-discriminatory explanation for why particular promotion procedures were used, if the record is construed in the light most favorable to the plaintiffs.

The decision to fill the Fowler vacancy through a separate process—i.e., not the statewide lieutenant recruitment process used to fill the Semmelrock vacancy—was one cause of the plaintiffs' not being considered for that particular vacancy, and CTU's use of that specialized process was, under one reading of the record, quite unusual, which supports an inference that the process was chosen with the intent to exclude minorities within CTU. *See Armstrong v. Metro. Transp. Auth.*, No. 07 CIV. 3561 DAB, 2014 WL 4276336, at *14 (S.D.N.Y. Aug. 28, 2014) ("It is well settled that departures from procedural regularity can create an inference of discriminatory intent, sufficient to establish a *prima facie* case of employment discrimination.") (quoting *Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 317 (E.D.N.Y. 2012)).

DOC and Colon have claimed that the plaintiffs were automatically considered for the Semmelrock vacancy by virtue of having successfully completed the statewide recruitment process, and no evidence suggests otherwise. *See infra* Subsection IV.B.iv. Using a separate process for the Fowler vacancy therefore meant that the plaintiffs were not automatically considered. There is also no dispute that the separate process was what permitted Fowler, who

never completed the statewide recruitment process, to be considered for the vacancy. Otherwise, only one white officer (Kowalski) and three minority officers (Browne, Martinez, and Reyes) within CTU could have been considered.

Although HR Specialist Faulkner described two separate but similar processes for selecting regular "statewide" lieutenants and site-specific "specialty" lieutenants, Faulkner Dep. at 16 ("If the vacancy is then going to be for a specialty post, . . . to fill it we would have to do a recruitment process for that. We couldn't just go to a transfer list . . . [o]r the statewide promotion list . . . ."); *id.* at 55, 66-69, he was unaware of any written policy for the non-statewide process, *id.* at 8, 11, and Colon appeared to have a different understanding about DOC lieutenant promotions, Colon Dep. at 18-19 ("Every lieutenant is required to go through the DAS process. . . . They all go through the same process to get on the DAS list. . . ."), as did Fontanto, Fontano Dep. at 29-30 ("A: We have specialty positions also as officers, and there is an interview process . . . . Q: Is that a separate process or is that an additional process after you're on the list, the promotional list? A: You have to be on the list first to be able to do these things. Q: And . . . the administrative positions that we're talking about, fall under those specialty positions . . . ? A: No. . . . Specialty positions are—usually require specific backgrounds. Like canine. If I'm going to be a canine lieutenant, typically I'm a canine officer."). The promotion list of CTU officers provided by both parties is also ambiguous; it contains a "Statewide Process" column that lists three eligible minority officers (Browne, Martinez, and Reyes), one eligible white officer (Kowalski), and two officers including Fowler who "[d]id not apply." ECF No. 43-12 at 8, Def.'s Exh. N; ECF No. 48-20, Pls.' Exh. R. The "Did not apply" label suggests that Fowler *could* have applied through the statewide process, and it is unclear whether the fact that he did not apply would ordinarily bar him from *any* lieutenant positions, as the plaintiffs

argue. Another column, labeled "CTU Process," lists Fowler as the "Selected Candidate" and everyone else as either "Not Eligible" or "Did not apply," which supports DOC's explanation, but there is no indication of who prepared the list or what the "CTU Process" column refers to.

Further, even if a fact-finder accepted DOC's claim that two official processes exist, there is considerable evidence that the process was used in a suspicious manner here. The plaintiffs claim that Sturgeon was transferred out of, and then very soon after back into, an "administrative" lieutenant position in order to channel Fowler into a regular shift lieutenant position, to which he would not be eligible for direct promotion, by first promoting him to the administrative position and then into the regular lieutenant position. Martinez and Browne have described that sequence of events in their testimony, Martinez Dep. II at 183-87; Browne Dep. I at 83-85, and although it is not clear whether their entire account is based on firsthand knowledge, Colon's deposition seems to adopt the same account, at least as to Fowler's quick lateral transfer into the regular lieutenant position and the fact that he would not have otherwise been eligible for the regular lieutenant position, Colon Dep. at 13-16; 34-35. It is also corroborated by three documents: a DOC memorandum from Faulkner dated November 4, 2010, announcing Fowler's promotion to administrative lieutenant, ECF No. 48-11, Pls.' Exh. I; a DOC memorandum summarizing Fowler's employment history and listing a "promot[ion] to Administrative Lieutenant, effective November 19, 2010," and "[a]ssign[ment] to 2nd Shift Supervisor Post at CTU Cheshire Base, effective January 3, 2011," ECF No. 48-23, Pls.' Exh. U; and the Transfer Memo from Shea dated December 15, 2010, reassigning Sturgeon—who, according to the plaintiffs' accounts, had previously been administrative lieutenant—to the position of administrative lieutenant. Fontano characterized this sequence of events as unusual. Fontano Dep. at 22 ("[I]t's hard to believe that it happened like this, but it did.").

The second cause of the plaintiffs' not being considered for the Fowler vacancy was that, according to them, they were unaware that they could apply, as a result of inadequate posting of notice within CTU. For the reasons already discussed, *supra* Subsection IV.B.iii.a, there is sufficient evidence that this too was a departure from usual practice.

A reasonable fact-finder, viewing the evidence in the light most favorable to the plaintiffs, could conclude that the plaintiffs were denied consideration for the Fowler position as a result of actions taken by a DOC official, Shea, that were intentionally discriminatory on the basis of race and/or national origin. The Court therefore DENIES summary judgment on the plaintiffs' disparate treatment claim as to the Fowler position.

### iv.  The Semmelrock Position

The plaintiffs also bring a claim of intentional discrimination in connection with the Semmelrock position, arguing that it, like the Fowler position, was inadequately advertised. Pls. 56 Stat. at 19 ¶ 16 ("The Fowler and Semelock [sic] promotional opportunity were not posted on the CTU bulletin board and were not relayed during any roll-call."); Compl. ¶ 23 ("Two available Correctional Lieutenant positions were not posted on the CTU bulletin board and were not announced at the Defendant's CTU facility during any roll-call."); *id.* ¶ 59 ("The specialized and non-specialized Correctional Lieutenant's promotional opportunities were not posted on the CTU bulletin board.").

As to the Semmelrock position, the plaintiffs' disparate treatment claim fails. Although the plaintiffs claim that they were unaware of this specific vacancy—which did not open up until late 2010, approximately a year after DOC completed the statewide application and interview process for lieutenant promotions in August 2009—they do not deny that the position was filled through the statewide lieutenant promotion process in which they participated in 2009. Nor is

35

there a genuine dispute that their applications were considered for the Semmelrock position in 2010. The plaintiffs admit in their Rule 56(a) Statement that they were considered. *See* Pls. 56 Stat. at 9-10 ¶¶ 29-32. While they also argue in their brief, in apparent self-contradiction, that "there is no support in the record for this claim," Opp. Br. at 4, they are incorrect. Colon testified in his deposition that although he did not put out a specific vacancy notice when the Semmelrock position opened up in 2010—which he claims that he was not required to do—he considered all the people who had previously expressed interest in "statewide" vacancies by participating in the statewide lieutenant promotion process. Colon Dep. at 68-69 ("After they already received their ranking, there's no additional requirement for them to apply or respond to a posting or show interest. That had already been evaluated."). He testified that both plaintiffs were among the candidates ranked "very good" on the promotion list that he reviewed. *Id.* at 95. He agreed that he "could have picked any of the very goods that were put before [him]" and testified that although he ultimately picked Semmelrock, "[i]t's not that [he] was looking at Martinez or Browne any less." *Id.* at 97. The plaintiffs have not produced any evidence contradicting Colon's account, so there is no genuine dispute as to this fact. As a result, no reasonable fact-finder could find for the plaintiffs on the basis of their theory that they were denied an opportunity to be promoted to the Semmelrock position due to insufficient notice of the vacancy. Because the plaintiffs raise no other claim of discrimination in relation to the Semmelrock position, and have produced no other evidence of racial or national origin discrimination with respect to that position, summary judgment is GRANTED on this claim.

### C.    Retaliation (Martinez)

Martinez, but not Browne, also alleges that after he filed his CHRO complaint,[14] he was subjected to retaliation by DOC. For the reasons set forth below, the Court will deny summary judgment on this claim.

### i.    Legal Standard

"In order to show a prima facie case of retaliation in response to a motion for summary judgment, a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014). "[A] plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer . . . which is more demanding than the motivating-factor standard . . . ." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). "Once an employee establishes a prima facie case, the burden shifts to the employer to put forth evidence of a non-retaliatory rationale." *Cox*, 760 F.3d at 145. "[T]he defendant's explanation of its legitimate reasons must be clear and reasonably specific" so that "the plaintiff [is] afforded a full and fair opportunity to demonstrate pretext." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) (quotation marks omitted). "Once the employer has done so, the employee may prevail by demonstrating that the stated rationale is mere pretext." *Cox*, 760 F.3d at 145. "The employee at all times bears the burden of persuasion to show a retaliatory motive." *Id.*

---

[14] Although the record contains references to complaints made internally within DOC, the filing of the CHRO complaint is the only protected activity alleged in the complaint. *See* Compl. ¶¶ 36, 68, 84-87.

"[T]he antiretaliation provision [of Title VII], unlike the substantive [antidiscrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). "An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." *Id.* at 63. "[A]ctions that are trivial harms—*i.e.*, those petty slights or minor annoyances that often take place at work and that all employees experience—are not materially adverse." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014) (quotation marks omitted). "But [c]ontext matters, as some actions may take on more or less significance depending on the context, and [a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Id.* (quotation marks and citations omitted).

### ii.     Discussion

DOC has not challenged the first two elements of Martinez's prima facie case for retaliation, and there is sufficient evidence in the record that Martinez suffered adverse actions causally connected to his filing the CHRO complaint. Martinez alleges many retaliatory incidents—thirteen by the Court's count—some of which are discussed below in greater detail. Taken collectively, even a subset of the incidents for which there is sufficient evidence of causation could be viewed by a reasonable fact-finder as amounting to "adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim." *Cox*, 760 F.3d at 145.

The types of adverse actions alleged by Martinez—reassignment, loss, or denial of certain duties, and instances of harassment by coworkers—are cognizable as forms of retaliation,

provided they are *materially* adverse, judged objectively in light of all the circumstances. *Burlington*, 548 U.S. at 71 ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.") (quotation marks omitted); *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) ("[U]nchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case.").

The evidence supporting Martinez's retaliation claim is limited but sufficient. It consists of his own account of what he experienced after he filed his CHRO complaint, which the fact-finder may well credit, along with the inference that the actions were taken in retaliation because they began soon after the CHRO complaint was filed. "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII," *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010), and "there is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a . . . right and an allegedly retaliatory action," *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (quotation marks omitted) (also noting that a gap of "five months might be enough to establish a prima facie case"); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) ("The seven-month gap between Summa's filing of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively remote."). "[A] court may exercise its judgment about the permissible inferences that can be drawn from temporal proximity . . . ." *White v. City of Middletown*, 45 F. Supp. 3d 195, 218 (D. Conn. 2014) (quotation marks omitted). But once an

employer has rebutted the prima facie case, "without more, such temporal proximity is insufficient to satisfy [the] burden to bring forward some evidence of pretext." *El Sayed*, 627 F.3d at 933.

Here, Martinez filed his CHRO complaint on May 31, 2011. As to some allegedly retaliatory incidents, Martinez has stated a particular time period—the earliest being an incident in August 2011 in which DOC human resources denied Martinez's request for medical leave to care for his wife without any reason (for which DOC has failed to proffer a non-retaliatory rationale). Martinez Dep. I at 61-62. As to others, the record reflects only that they occurred after the CHRO complaint was filed. It is reasonable to infer that those incidents occurred before Martinez left CTU on June 1, 2012, *see* Martinez Dep. II at 155 (stating that he left CTU because of the retaliation), and therefore that they occurred within a year of his CHRO complaint. Given that the plaintiff is alleging a string of retaliatory incidents over the course of that year, some earlier than others, it would not be unreasonable for a fact-finder to view the later incidents as temporally related to the CHRO complaint, even though the timing of any single one of the later incidents, viewed in isolation, might not reasonably permit an inference of causation.

As one instance of retaliation, Martinez claims that his "high security transporting" assignment was moved fifty miles away to "North Base." Martinez Dep. I at 43-45, 109-13. He declined an offer from Shea to continue in the assignment because Shea "gave me an option that wasn't feasible, and he knew that." *Id.* at 112. The assignment offered good experience, provided opportunities for overtime, and made an officer more promotable, but keeping the position would have resulted in two additional hours of unpaid travel time to and from work and interfered with Martinez's ability to care for his disabled wife. *Id.* at 43-45; 109-113. Further, Martinez was told that he would have to drive his own car to North Base at his own expense, whereas Semmelrock,

who also performed those duties at North Base, was issued a state vehicle and was given gas. *Id.* DOC's proffered non-retaliatory rationale is that "Colon ordered that these job duties be transferred to another location for purely economic and logistical reasons." SJ Mot. at 19. But Martinez argues, and a reasonable fact-finder might agree, that this very general rationale does not adequately explain what happened. Martinez points out that, according to Colon, not all high security transporting positions at CTU were moved to North Base, and CTU "chose to move at least two positions," Colon Dep. at 103, which does not explain why Martinez specifically was chosen or why he was not provided with a state-issued vehicle.

Martinez also claims that following his CHRO complaint, CTU discontinued his assignment as a commercial driver's license ("CDL") trainer within DOC, which came with no additional pay but which helped build his resume, and he was replaced by two Caucasian officers. Martinez Dep. I at 99, 116-20. DOC emphasizes that Martinez admits that he was asked at a later point if he was still interested in CDL training and refused, saying he could not do CDL training at that time because he was on "light-duty." *Id.* The fact-finder may reasonably choose, however, to analyze the original decision to remove Martinez from CDL as evidence of retaliation by DOC officials, notwithstanding the later offer to reverse the decision. This incident therefore factors into Martinez's prima facie demonstration of an "adverse employment action." Further, DOC has not met its burden to rebut this claim. Its proffered non-retaliatory rationale is merely the bald assertion in its brief that "[i]t is not unreasonable for DOC to rotate training opportunities among its staff." SJ Mot. at 18. DOC has not "produc[ed] *evidence* that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason," *Burdine*, 450 U.S. at 254 (emphasis added), and its explanation is not "clear and reasonably

41

specific" enough for Martinez to be "afforded a full and fair opportunity to demonstrate pretext," *id.* at 258.

In December 2011, Martinez filed a complaint with DOC, alleging that he had applied for a "temporary service in a higher class" ("TSHC") position, was denied, and was told that his unit was not putting officers into TSHC positions, despite the fact that a corrections officer, Officer Martin, was currently serving in a TSHC position. ECF No. 48-26, Pls.' Exh. X. DOC has failed to proffer a non-retaliatory explanation, aside from denying altogether that Martinez ever applied for a TSHC position, based on a portion of Martinez's deposition in which he said that he had never applied to be an "acting lieutenant" because he had no interest. Martinez Dep. I at 18-20. Martinez, however, claims that he did apply for a TSHC position, Pls.' Exh. X, and argues that failing to apply for an "acting lieutenant" position does not mean that he never applied for a TSHC position, which presents a factual dispute for the fact-finder.

The Court need not address the remaining instances of alleged retaliation because the aforementioned incidents are enough to conclude that Martinez's retaliation claim must be left for the fact-finder. Summary judgment is therefore DENIED on this count.

## V.     Conclusion

For the reasons set forth above, the Motion for Summary Judgment (ECF No. 43) is GRANTED IN PART AND DENIED IN PART. The case proceeds only as to Martinez's retaliation claim and both plaintiffs' disparate treatment claim in relation to the Fowler promotion, but not in relation to the Semmelrock promotion.

**SO ORDERED** this 28th day of August 2015 at Hartford, Connecticut.


_____/s/_____
Michael P. Shea
United States District Judge